RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KATIE KINDL,

              *Plaintiff-Appellee,*

    *v.*

CITY OF BERKLEY, et al.

              *Defendants,*

KENT HERRIMAN; MICHAEL MOSCHELLI,

              *Defendants-Appellants.*

No. 13-2234

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-13410—Bernard A. Friedman, District Judge.

Argued: January 13, 2015

Decided and Filed: August 18, 2015

Before: SUHRHEINRICH, CLAY, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. Donald M. Fulkerson, Westland, Michigan, for Appellee. **ON BRIEF:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. Donald M. Fulkerson, Westland, Michigan, for Appellee.

    CLAY, J., delivered the opinion of the court in which ROGERS, J., joined, and SUHRHEINRICH, J., joined in the result.

---

**OPINION**

---

CLAY, Circuit Judge.    Officer Kent Herriman and dispatcher Michael Moschelli ("Defendants," collectively) appeal from the district court's ruling denying their motions for qualified immunity, Michigan governmental immunity, and summary judgment in this suit arising from the death of Lisa Kindl ("Kindl").  Kindl died of delirium tremens, a severe form of alcohol withdrawal, within less than a day of being taken into custody—and after receiving no medical attention for her condition.  For the reasons that follow, we **DISMISS** the appeal of the district court's qualified immunity and summary judgment rulings for want of jurisdiction, and we **AFFIRM** the district court's ruling denying Michigan governmental immunity.

**BACKGROUND**

*Procedural History*

Following Lisa Kindl's death, her daughter Katie Kindl ("Plaintiff") filed the instant action in state court asserting constitutional violations under 42 U.S.C. § 1983 and gross negligence, the intentional infliction of emotional distress, and other claims under Michigan law. Defendants removed the case to federal court.  Following discovery, the parties filed cross motions for summary judgment.  As relevant to the present appeal, the district court ruled that Plaintiff's individual claims of deliberate indifference and intentional infliction of emotional distress could proceed solely as to two officers, Herriman and Moschelli.  The court dismissed the other claims and defendants from the case and denied Defendants' claims to qualified immunity under § 1983 and governmental immunity under Michigan law.  Upon Plaintiff's motion for reconsideration, the district court reinstated her claim of gross negligence.

Defendants timely noticed their interlocutory appeal.  Plaintiff moved to dismiss the appeal, arguing that because the parties' dispute about qualified immunity concerned factual issues rather than disputes about the clarity of existing law, we lacked subject matter jurisdiction to hear the appeal under *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995).  A motions panel denied the motion on the basis that "the factual-legal issue governing jurisdiction is a close call" in this

case, judging it best to allow the merits panel to consider the jurisdictional issue with the benefit of the full briefing of the parties. (No. 13-2234, Order, at 2.) One of our colleagues dissented from the denial of the motion, arguing that Defendants have not presented a pure issue of law fit for interlocutory appellate review. The parties duly completed their briefing, and the appeal was presented to this panel for resolution.

### Factual Background

Lisa Kindl reported to a probation appointment on the morning of July 12, 2010. She admitted to drinking vodka the evening before, and a breathalyzer test revealed a blood alcohol level of .053. She was arrested for violating a condition of her probation that she refrain from alcohol use, and she was placed in the custody of the Berkeley Department of Public Safety to await a court hearing the following day.

The video recording of her booking shows Kindl telling an officer, who is identified by the parties as Officer Geary, that she was anxious and that she "might have a little alcohol withdrawal." (R. 32-9 at 9:55 a.m.) After booking, Kindl was given a blanket and placed in cell one, which was subject to video monitoring and direct visual observation by the front desk. Officer Geary remained the officer on duty at the front desk until 7 p.m. He testified in his deposition that he informed the desk officer replacing him, Officer Herriman, of Kindl's comment about suffering from alcohol withdrawal. Herriman, however, denied in his deposition that he had knowledge about Kindl's risk of alcohol withdrawal at the beginning of his shift.

The video footage of Kindl's time in cell one constitutes a significant, though notably imperfect, source of evidence in this case. The video is black and white and has no sound. Additionally, based on what appears to be a motion-activated aspect of the recording technology, the image (together with the time-stamp) frequently freezes for seconds or even minutes at a time when Kindl is lying down.

Kindl spent much of the morning and afternoon of July 12, 2010 lying on the cement bench in various positions, covered by the blanket she was given by jail staff, or intermittently standing by the door to the cell, looking out through the small window in the door. Her condition worsened in the evening. At 7:46 p.m., the video shows her entire body jerking

dramatically in an apparent seizure lasting about thirty seconds.  Shortly after 8 p.m., Kindl began trying to get the attention of the officers.  From the video it is apparent that her shorts were wet—she appeared to have urinated on herself.  The video shows Kindl knocking on the large monitoring window four different times, repeatedly calling out, and peering through both that window and the smaller window in the door to her cell.

Kindl eventually succeeded in speaking with Herriman and Moschelli.  Because the video lacks audio, the conversation is not recorded.  In a statement signed the following day, Herriman reported that Kindl told them that she had urinated on herself "and that she was concerned she may go into DTs [*i.e.*, delirium tremens] at some point."  (R. 29-8, Herriman Statement & Dep., PageID 473.)  According to both officers' statements, Moschelli asked Kindl what she needed, and Kindl asked for them to keep an eye on her.  Moschelli assured her that he would.  The officers repeated this version of events in their deposition testimony.  Moschelli testified that he asked Kindl during this conversation "if she was having any symptoms as we spoke" and that she replied no.  (R. 29-7, Moschelli Dep., PageID 437.)  Herriman testified that he frequently checked Kindl by means of the video monitor and the cell window throughout the rest of his shift, which lasted until 1:30 a.m.  Moschelli testified that he left the intercom on for Kindl's cell so that they would hear anything that occurred.

Kindl lay back down on the cement bench following her conversation with Defendants.  Throughout the rest of the evening, the video shows her intermittently experiencing convulsions and seizures and, on a number of occasions, calling out or speaking.  At 8:34 p.m., as she was lying on the bench, the video shows her body convulsing for about fifteen seconds.  At 8:56 p.m., she got up and leaned her face to the monitoring window as if attempting to look through.  She appeared to shout, and then quickly returned to lying on the cement bench.  At 10:25 p.m., as Kindl was lying on her side, her body began to convulse and she fell backwards off the cement bench onto the floor.  After the fall, she picked herself up and sat on the opposite bench for a while, then appeared to speak, looking repeatedly at the monitoring window.  After using the toilet, she walked over to the monitoring window and again seemed to speak.  She did not stay standing long, but wrapped the blanket around herself and sat again on the cement bench, then eventually lay down again.

During the hour and a half that followed, Kindl was almost exclusively lying down. Although the video quality is too poor to be certain, some of her movements are consistent with shaking. At 11:52 p.m., the video shows Kindl lying on the cement bench with her head close to the monitoring window. At 11:53:45 p.m., she experienced a violent seizure that lasted for approximately forty seconds. When the seizure ended, Kindl was lying on her stomach with her arms above the blanket at odd angles. Although the precise time of her death has not been determined, she did not move again after that seizure ended.

Six hours passed before Kindl's body was discovered in that same position by Herriman and another officer. Forensic pathologist Werner Spitz, M.D testified that Kindl died of delirium tremens. According to the National Institutes of Health, delirium tremens is "a severe form of alcohol withdrawal that involves sudden and severe mental or nervous system changes." (R. 28-2, NIH Article, PageID 217.) The condition is "serious and may be life threatening" if treatment is not provided. (*Id.* at 218-19.) Spitz reviewed the video and testified in his deposition that Kindl displayed "classical manifestations" of delirium tremens, including sweating, urinary incontinence, tremors, and seizures. (R. 33-4, Spitz Deposition, PageID 1316-20.) Spitz also noted the possibility that Kindl experienced auditory or visual hallucinations based on her confused behavior.

The parties dispute the knowledge about alcohol withdrawal and delirium tremens that can be attributed to Herriman and Moschelli. Chief of Police Richard Eshman testified that he required his officers to be medical first responders, a level of training between first aid and an emergency medical technician. Under his orders, two officers were required to go to every ambulance run in the city in order to increase the officers' exposure to trauma and medical response. Although the department did not provide specific training to its officers about alcohol withdrawal, Eshman testified that he believes "everybody knows alcohol withdrawal and subsequent D.T.s is a serious medical condition." (R. 29-17, Eshman Dep., PageID 618) Both Herriman and Moschelli testified that they were aware that alcohol withdrawal could be a serious and even deadly condition, though Moschelli asserted he did not know in July 2010 that alcohol withdrawal could be fatal. Both Defendants testified that they never saw Kindl have a possible seizure and that she never showed any signs of physical distress.

The record also contains deposition testimony by two other detainees confined in the Berkeley Department of Public Safety that night. Michael McClanahan, who was detained in cell two beginning around 7:30 p.m. that evening, testified to hearing Kindl calling out for help, trying to get the officers' attention, and moaning as if unwell for an hour or two until she eventually quieted down. He also testified to seeing her with the blanket wrapped around her shoulders, and described her as visibly sick, in "shock" with a "clammy look" and "just no expression." (R. 33-7, McClanahan Dep., PageID 1333-36.) A second detainee, Andre Henry, testified that as he was being booked into the jail that evening, he heard a woman calling for help with no response from the officers, who told him that "she was a bug," *i.e.*, crazy. (R. 33-8 Henry Dep., PageID 1337-40.) The video establishes, however, that Henry did not arrive to the Berkley Department of Public Safety until approximately 3:30 a.m., hours after Kindl suffered her final seizure.

## DISCUSSION

### I.      Qualified Immunity

Defendants moved for summary judgment on the basis that they were entitled to qualified immunity with regard to Plaintiff's deliberate indifference claim. Qualified immunity protects government officials sued under § 1983 from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted). To qualify as clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)) (editing in original).

Plaintiff asserts that Defendants violated her mother's right to adequate medical treatment under the Fourteenth Amendment. To succeed on her claim, she must show that Defendants "acted with deliberate indifference to [Kindl's] serious medical needs." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (quotation marks omitted). This task entails an objective showing that Kindl had a "sufficiently serious medical need," and a subjective showing that "the defendant possessed a sufficiently culpable state of mind in denying medical care." *Id.*

(citations and quotation marks omitted). The district court held that Plaintiff established a dispute of material fact as to both prongs of this inquiry and denied Defendants' request for qualified immunity on that basis.

The denial of qualified immunity in a § 1983 case is a final, immediately appealable decision under the collateral order doctrine only to the extent the appeal presents a "neat abstract issue[] of law." *Johnson v. Jones*, 515 U.S. 304, 317 (1995) (quotation marks omitted); *see also Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir. 2009) ("In considering the denial of a defendant's claim of qualified immunity, . . . our jurisdiction is limited to resolving pure questions of law."). Thus, an interlocutory appeal of the denial of qualified immunity at summary judgment may typically only test "'the substance and clarity of pre-existing law.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011)). We lack jurisdiction to review a summary judgment ruling on qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S at 319-20; *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014) (discussing *Johnson*'s holding that "an order denying summary judgment based on a determination of 'evidence sufficiency' does not present a legal question" appropriate for review under the collateral order doctrine).

Defendants' principal arguments regarding qualified immunity reduce merely to a factual contention that Plaintiff cannot prove that they should have known of, much less that they were in fact aware of, Kindl's serious medical need. We lack jurisdiction to consider these arguments. *Johnson*, 515 U.S. at 319-20. Defendants also attempt rather incredibly to argue that Kindl did not have a serious medical need. This, too, is a factual dispute that does not qualify as a pure question of law sufficient to create appellate jurisdiction at this stage of the proceedings.

### A. Defendants' Knowledge of Kindl's Serious Medical Need

At bottom, Defendants contest the sufficiency of Plaintiff's evidence to establish their knowledge of Kindl's condition. For example, they argue that Kindl's statement during her booking about experiencing alcohol withdrawal is insufficient to establish that the officers knew she was suffering from a serious medical condition, that she only once sought the officers' attention and then only requested they keep an eye on her, and that no evidence in the record

supports a conclusion that Kindl suffered from delirium tremens.  These are arguments merely of "'evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial,'" and are therefore beyond our jurisdiction on this appeal.  *Plumhoff*, 134 S. Ct. at 2019 (quoting *Johnson*, 515 U.S. at 313); *see also Ortiz*, 562 U.S. at 190-91 (holding that the defendants did not raise a purely legal issue where the pre-existing law regarding deliberate indifference in a failure to protect context was "not in controversy" and defendants' arguments instead addressed factual questions concerning what the officers knew and what they could have done to protect the plaintiff).

Defendants make a number of arguments in an attempt to circumvent the jurisdictional bar.  First, Defendants invoke the Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007) as authorizing review of the district court's factual determinations in this case.  *Scott* came before the Supreme Court on an interlocutory appeal from the district court's denial of qualified immunity in a § 1983 excessive force case concerning police conduct in a high-speed car chase.  *Id.* at 375-76.  Relying on a video of that chase from the dashboard of a police vehicle, the Supreme Court rejected the trial court's finding of a genuine issue of material fact because in light of the video, the plaintiff's version of the facts was "so utterly discredited by the record that no reasonable jury could have believed him."  *Id.* at 380.  The Court found that the video conclusively established the dispositive fact that the plaintiff's reckless driving during the chase placed "officers and innocent bystanders alike at great risk of serious injury," and that, as a matter of pure law in light of that incontestable fact, the defendant acted reasonably under the Fourth Amendment by ramming the plaintiff's car.  *Id.* at 380, 383-84.

Although the opinion in *Scott* did not discuss the jurisdictional question, because it reversed the district court's holding that there was a genuine dispute of material fact precluding qualified immunity at the summary judgment stage, we have recognized that it represents an exception to *Johnson*.  *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 493 (6th Cir. 2012); *Moldowan*, 578 F.3d at 370-71.  That exception is narrow:  only "where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false" based on irrefutable evidence such as clear video footage, "a court of appeals may say so, even on interlocutory appeal."  *Moldowan*, 578 F.3d at 370 (quotation marks omitted); *see also Romo*

*v. Largen*, 723 F.3d 670, 675 (6th Cir. 2013) (construing *Scott* as a limited exception only applicable where there are "blatantly contradicted facts"); *Austin*, 690 F.3d at 493 (quoting *Scott*, 550 U.S. at 380-82) ("Although we must view the facts as assumed by the district court, to the extent this version of events is 'blatantly contradicted' by videotape evidence, we must 'view[ ] the facts in the light depicted by the videotape.'").

Defendants first argue that the video of Kindl's time in cell one conclusively establishes that she did not act in a way that would have alerted the two officers to her need for medical treatment. We need not decide whether a video with such frequent lapses as the one in this case may even qualify as the sort of irrefutable evidence that would come within the *Scott* exception because, upon our review, even with its imperfections, the video reflects that Kindl sought the attention of the officers after experiencing a seizure, that she urinated on herself, that she fell off the bench, and that she experienced additional seizures before her death. Moreover, the video does not conclusively establish, as Defendants claim, that she never again sought help after the 8 p.m. conversation—to the contrary, it shows her apparently calling out on at least one occasion, and at other points the video footage would be consistent with her speaking.

Defendants also argue that the video contradicts the district court's reliance on the testimony of the other detainees, McClanahan and Henry. The video does not blatantly contradict McClanahan's testimony. Although McClanahan acknowledged that he was unable to see Kindl except from a particular position, he was able to describe seeing her stand with her arms wrapped around her middle, seeing her seek attention from the camera and the officers, and seeing her with the blanket around her shoulders—all descriptions that coincide with events recorded by the video. And his testimony that he heard her call out for help and moan in discomfort over a period of hours is not contradicted by the silent video. Defendants appear to be correct that Henry's testimony is irreconcilable with objective video evidence that Kindl's final movements occurred hours before his arrival at the jail. Yet the district court's error as to Henry is insufficient to trigger appellate jurisdiction under *Scott*. In *Scott*, the video evidence placed a dispositive fact beyond any dispute, leaving the record without any "'*genuine* issue of *material* fact,'" and therefore permitting resolution of the Fourth Amendment issue as a pure question of law. 550 U.S. at 380 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986) (emphasis added by *Scott*)). Here, even if Henry's testimony were eliminated, genuine disputes of material facts would remain, based on the video evidence and the other testimony in the case, precluding appellate jurisdiction at this stage in the proceedings. *See id.*; *see also Moldowan*, 578 F.3d at 370-71.

Next, citing the concurring opinion in *Romo*, Defendants urge this Court to relax the jurisdictional boundaries imposed by *Johnson v. Jones* and review the "inferences" to be drawn from the factual record. *See Romo*, 723 F.3d at 679 (Sutton, J. concurring) (arguing that inferences derived from factual details in the record "remain subject to interlocutory review"). This argument is contrary to both Sixth Circuit and Supreme Court precedent. Factual "inferences" capable of being drawn from the evidence are still inherently factual determinations about what parties "may, or may not, be able to prove at trial." *Johnson*, 515 U.S. at 313. Embracing appellate jurisdiction over "inferences" offers no principled limit to appellate review of factual disputes relevant to qualified immunity because in many cases, including this one, the "inferences" at issue are nothing more than aggregate factual questions. We are in no better a position than the district court—or more to the point, a jury—to determine whether based on Kindl's statements, convulsions, alleged moans, requests for attention, and appearance, Defendants subjectively understood the gravity of her situation. The ultimate "inference" regarding Defendants' knowledge depends on credibility determinations as well as the composite of evidence ultimately put before a jury. Permitting interlocutory appellate review under the guise of considering only "inferences" would thus erase the well-established boundaries protecting the function of the ultimate factfinder and deviate from binding precedent set out in *Johnson* and its progeny.

The majority in *Romo* declined to join the concurrence in anticipating *Johnson*'s overruling. 723 F.3d at 675 (majority opinion) ("[T]o accept the reading of *Johnson* advocated by the concurrence, we would have to read *Scott* to have foreshadowed the overruling of Johnson's explicit holding." (footnote omitted)). Subsequent developments have validated their caution. The Supreme Court has since reaffirmed *Johnson*'s holding that a trial court's determination that there is a genuine dispute of fact—"*i.e.*, which facts a party may, or may not, be able to prove at trial"—is not fit for interlocutory review under the collateral order doctrine.

*Plumhoff*, 134 S. Ct. at 2019 (applying *Johnson* and reviewing only the "legal issues" regarding the reasonableness of the use of force in a high speed car chase).

#### B.    The Seriousness of Kindl's Medical Condition

Incredibly, Defendants also argue that Kindl did not have a serious condition entitling her to medical treatment—despite the undisputed evidence that her condition entailed incontinence and multiple seizures, and that it ultimately resulted in her death.  This argument is without merit.  A medical condition is sufficiently serious to confer constitutional protections where delay in treatment may cause "a serious medical injury."  *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 898 (6th Cir. 2004).[1]  This poses a question of fact capable of resolution by competent evidence, including, of course, evidence that the detainee died as a result of the medical condition.  *See id.*  Thus, even if Defendants *could* credibly point to evidence that Kindl's condition was not serious, such a fact-based question is beyond the scope of our jurisdiction under *Johnson*.  *See* 515 U.S. at 317.

Defendants attempt to circumvent both the facts and the jurisdictional limitations of this Court by selective citation to cases which they argue suggest that alcohol withdrawal is not a serious medical condition for which a detainee has a right to be treated.  There is no merit to their arguments.

In a case not cited by Defendants, this Court unequivocally recognized—prior to Kindl's detention—that "delirium tremens . . . is a life-threatening condition caused by acute alcohol withdrawal."  *Smith v. Cnty. of Lenawee*, 600 F.3d 686, 688 (6th Cir. 2010) ("*County of Lenawee*"); *see also Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009) ("[W]e have found that a detainee lying face down, unresponsive and exhibiting symptoms of *delirium tremens* showed medical need sufficient for lay people to recognize he needed medical attention.") (citing *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009)).  The substance

---

[1]A medical need may also qualify as objectively serious "if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Blackmore*, 390 F.3d. at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)) (emphasis added by *Blackmore*).  For all the reasons discussed above with regard to Defendants' knowledge, material disputes of fact about the obviousness of Kindl's distress would preclude our jurisdiction over the application of this test, as well.

and clarity of existing law in this context is thus not reasonably in dispute. *See Ortiz*, 562 U.S. at 190-91.

The cases cited by Defendants do not suggest that there is any genuine question of law related to a detainee's right to receive medical treatment for acute alcohol withdrawal or delirium tremens. They principally rely on *Speers v. County of Berrien*, 196 F. App'x 390 (6th Cir. 2006) (*per curiam*), yet in that case we explicitly recognized that delirium tremens is a severe form of alcohol withdrawal and is unquestionably a serious medical condition within the meaning of the Fourteenth Amendment:

> With regard to the objective inquiry—was the threat sufficiently serious?—the district court correctly held that a material fact dispute exists. The cause of Speers' death, to be sure, is disputed. But taking the facts in the light most favorable to the plaintiffs, we must assume as their experts attest that Speers was suffering from a serious condition—"delirium tremens . . . a well recognized manifestation of alcohol withdrawal." Expert testimony showed that delirium tremens, if untreated, is often fatal—which assuredly makes it a "serious" medical condition.

196 F. App'x at 394 (citations omitted). Defendants emphasize a passage in *Speers* in which we acknowledged that the terms "alcohol withdrawal" and the "D.T.s" are often used interchangeably—for this reason, we explained, an official's use of the term "D.T.s" did not indicate, without more, that the official was aware that the patient's condition was acute. *See id.* at 395. Thus, the distinction was relevant only to evidence of the official's knowledge—not to the objective seriousness of the medical need. *See id.* Defendants also misleadingly cite our statement in *Speers* that "general alcohol withdrawal [] typically may be managed in a prison setting" to suggest that they were not under a duty to provide Kindl with medical attention. *Id.* The quotation must be placed in context: Speers *received medical treatment* at the prison. He was placed on sick call, examined by a doctor, given medication, and placed in the medical observation cell. *Id.* at 392. Moreover, in *Speers*, we affirmed the denial of qualified immunity to two officers who were responsible for monitoring the inmate in the hours before his death during a period when another prisoner testified he was exhibiting serious symptoms, including collapsing, a seizure, "having a strange look," and foaming at the mouth. *Id.* at 398. We explained that based on these symptoms, a jury could "fairly infer . . . that Speers faced a substantial risk of serious harm." *Id.* The guards' knowledge about alcohol withdrawal as a

condition was not dispositive: "*With or without alcohol withdrawal, with or without training*, the symptoms that Warner reported establish a *triable issue of fact* about whether the guards should have contacted medical personnel in response to this problem or at least should have tried to engage Speers verbally or entered his cell." *Id.* at 398 (emphasis added). Thus, nothing in *Speers* suggests that there exists a "neat abstract issue[] of law" about the objective seriousness of alcohol withdrawal as a medical condition. *Johnson*, 515 U.S. at 317.

Defendants' citation to *Meier v. County of Presque Isle*, 376 F. App'x 524 (6th Cir. 2010) and *Smith v. Pike County, Kentucky*, 338 F. App'x 481 (6th Cir. 2009) (*per curiam*) ("*Pike County*") is similarly unavailing. In *Meier*, we affirmed summary judgment awarded to the defendants on a deliberate indifference claim arising from Meier's falling into a coma as a result of alcohol withdrawal. 376 F. App'x at 531. In that case, where Meier was arrested with a BAC level of .31 but "cooperated, communicated effectively, and walked unassisted," we held that the plaintiff had not established evidence that the arresting officer had knowledge of the seriousness of the detainee's medical condition. *Id.* at 529-30. Thus, *Meier* turned on the sufficiency of the evidence with regard to the officer's knowledge—a factual issue that was properly before us on review of a final judgment. The case in no way suggests any legal basis for questioning the seriousness of the detainee's medical need. *See id.* *Pike County*, too, affirmed the award of summary judgment to the defendants where "[t]he evidence [did] not establish that [the] jail officials were aware that Roberts had a sufficiently serious medical need or that they acted in conscious disregard by refusing medical care." 338 F. App'x at 482.

In sum, Defendants fail to identify any pure question of law that might entitle them to qualified immunity on the objective element of the deliberate indifference claim. The cases they cite in aid of their appeal do not cast into doubt the seriousness of alcohol withdrawal as a medical condition, much less overcome the existence of evidence supporting the district court's conclusion that Plaintiff met her summary judgment burden in establishing that Kindl had a serious medical need. Instead, each case cited by Defendants discusses whether the particular evidence in the record was sufficient to show that the defendants "appreciated" the detainee's medical needs. *See, e.g.*, *Meier*, 376 F. App'x at 529. Defendants' arguments in reliance on these cases, at bottom, repackage their factual dispute with regard to the subjective prong of

Plaintiff's deliberate indifference claim. Because Defendants are simply making another "impermissible argument[] regarding disputes of facts," *Estate of Carter*, 408 F.3d at 310, we do not have jurisdiction over their appeal of the district court's denial of qualified immunity.

## II.    Michigan Governmental Immunity

In addition to the federal Fourteenth Amendment claim, Plaintiff has also asserted two claims under Michigan law:  gross negligence and intentional infliction of emotional distress. The district court held that both claims survived summary judgment, and that Defendants were not entitled to Michigan governmental immunity on either claim.  Under Sixth Circuit precedent, a district court's ruling denying Michigan governmental immunity under Michigan Compiled Laws § 691.1407 is a "final order" that may be immediately appealed under 28 U.S.C. § 1291. *County of Lenawee*, 600 F.3d at 689-90.  We review the denial of governmental immunity at the summary judgment stage *de novo*, drawing all inferences in favor of the non-moving party. *Younes v. Pellerito*, 739 F.3d 885, 890 (6th Cir. 2014).  "[W]here a plaintiff has made a sufficient showing to create a genuine issue of fact," summary judgment on the basis of governmental immunity is precluded.  *Id.* (quotation marks omitted).

Michigan law on governmental immunity for public officials contains different tests for negligence claims and intentional torts.  Mich. Comp. Laws § 691.1407(2) & (3); *see also Odom v. Wayne Cnty.*, 760 N.W.2d 217 (Mich. 2008) (discussing both tests in depth).  The standard applicable to negligence claims is spelled out at § 691.1407(2) and includes the following three requirements:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The officer's, employee's, member's, or volunteer's conduct *does not amount to gross negligence* that is the proximate cause of the injury or damage.

§ 691.1407(2) (emphasis added).  For purposes of the immunity statute, gross negligence occurs when a defendant's conduct is "so reckless as to demonstrate a substantial lack of concern for whether an injury results."  § 691.1407(8)(a).  Where material disputes of fact exist as to whether the conduct was grossly negligent, award of governmental immunity at summary judgment is

improper. *Oliver v. Smith*, 810 N.W.2d 57, 62 (Mich. Ct. App. 2010). A jury could find that Defendants displayed "a substantial lack of concern for whether an injury results" when they failed to seek or provide any medical assistance for Kindl despite having been alerted to her condition (both by Kindl and, allegedly, by Officer Geary) and despite her visible symptoms including multiple seizures, urinary incontinence, and falling off the bench. Additionally, a jury could credit McClanahan's testimony that Kindl was calling for help, and they could interpret the video evidence as corroborating his testimony. These permissible factual findings would support a conclusion that Defendants failed to adequately monitor Kindl's condition, or that they were aware of her condition but chose not to act, or even that they ignored her direct requests for help knowing that she was suffering from alcohol withdrawal—all of which could constitute gross negligence within the meaning of §§ 691.1407(2)(c) and (8)(a). Moreover, Defendants' contention that their failure to provide needed and potentially life-saving treatment to a detainee within their custody was not "the" proximate cause of Kindl's death is entirely without merit. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 552-53 (6th Cir. 2009). Defendants were under a duty to provide Kindl with needed medical care, and Plaintiff has proffered evidence that their failure to do so resulted in Kindl's death. Governmental immunity on this count was properly denied.

Defendants' claim of governmental immunity with regard to Plaintiff's claim of intentional infliction of emotional distress is governed by the common law. § 641.1407(3); *Odom*, 760 N.W.2d at 223. Under *Odom*, an official is entitled to governmental immunity for an intentional tort if he establishes the following:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

760 N.W.2d at 228. The district court held that if the jury found that Defendants "ignored [Kindl's] pleas for help under the circumstances as described by inmates McClanahan and Henry, then the jury could also find that these defendants did not act in good faith (and are

therefore not entitled to immunity).'" (R. 41 at 1761.)  As discussed earlier, the jury could not credit Henry's testimony because it is contradicted by objective video evidence.  However, the jury could still credit McClanahan's testimony to reach the same determination.  Governmental immunity was properly denied on this claim as well.  We do not address the substantive elements of the claim for intentional infliction of mental distress.

### III.    Pendent Jurisdiction

Defendants ask us to exercise pendent jurisdiction to review the district court's denial of summary judgment on Plaintiff's claims.  Because the denial of a motion for summary judgment is not an appealable order, we may exercise pendent jurisdiction to review the ruling on collateral review of an immunity ruling only where the appealable and non-appealable issues are "inextricably intertwined," meaning that "the appealable issue at hand cannot be resolved without addressing the nonappealable collateral issue."  *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998); *see also Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1025, 1028 (10th Cir. 1998) ("[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." (citation and quotation marks omitted)).  If this standard is met, we may exercise pendent jurisdiction as a discretionary matter.  *Id.*

Plaintiff's deliberate indifference claim is not inextricably intertwined with Defendant's claim of Michigan governmental immunity on the tort claims—the only issue over which we have freestanding jurisdiction in this appeal—because the two are governed by distinct standards and different bodies of law.  *Compare Estate of Carter*, 408 F.3d at 311 *with* Mich. Comp. Laws §§ 691.1407(2) & (3); *see also Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012) (distinguishing between deliberate indifference under the federal constitution and gross negligence under Michigan law).  We need not decide whether the substantive state law claims are inextricably intertwined with the Michigan governmental immunity analysis because we would decline in any event to exercise our discretion to review the district court's summary judgment ruling on those claims.  *See Chambers*, 145 F.3d at 797.

**CONCLUSION**

For the foregoing reasons, we **DISMISS** the appeal of the district court's qualified immunity and summary judgment rulings for want of jurisdiction, and we **AFFIRM** the district court's ruling denying Michigan governmental immunity.